

WOLLMUTH MAHER & DEUTSCH LLP
David H. Wollmuth
Vincent T. Chang
Thomas Filardo
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

Attorneys for Plaintiff AMA Capital Partners LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

AMA CAPITAL PARTNERS, LLC,  :  Case No.: _____

                      Plaintiff,  :

     -against-  :  **COMPLAINT**
                      :  **AND DEMAND FOR**
SERGIO DEL BENE, INVERSIONES  :  **JURY TRIAL**
PATAGONIA LTDA., and DEL BENE S.A.C.I.F.,  :

              Defendants.  :

                           :

-------------------------------------------------------------x

Plaintiff AMA Capital Partners LLC ("AMA" or "Plaintiff"), by its attorneys

Wollmuth Maher & Deutsch LLP, respectfully alleges, upon knowledge with respect to its own

acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This action involves the defendants' failure to pay a Transaction Fee to

Plaintiff upon the closing of a transaction for which the Plaintiff was the exclusive financial

adviser.

2.     In November of 2005, AMA and defendants Sergio Del Bene ("Del

Bene"), Inversiones Patagonia Ltda. ("IPL"), and Del Bene S.A.C.I.F. ("DBSACIF")

(collectively, the "Defendants") entered into an agreement, dated November 4, 2005 (the

"Agreement"). A true and correct copy of the Agreement is annexed hereto at Exhibit A and is incorporated herein by reference. Unless otherwise specified, all terms that are capitalized in this Complaint are defined in accordance with the definitions in the Agreement. Pursuant to the Agreement, the Defendants appointed AMA their exclusive financial adviser in connection with the potential sale (the "Transaction") of the Defendants' interest in Emparesas Navieras S.A. ("Navieras"), a Chilean company.

3.      The Agreement provided that AMA would render certain services in connection with the Transaction, including soliciting bids and preparing marketing documents. In return, Defendants agreed to pay AMA a monthly retainer and a Transaction Fee (as defined in ¶3(a) of the Agreement) upon the closing of a Transaction and the occurrence of certain other conditions.

4.      Pursuant to its terms, the Agreement, originally six months in duration, was extended many times by virtue of the parties' subsequent written agreements and their course of dealing. In reliance upon those extensions, AMA continued rendering all of the services specified in the Agreement to the Defendants until November of 2007. At that time, the Defendants disclosed to AMA that they were entering into a Transaction, but Defendants breached their obligation to pay AMA a Transaction Fee.

5.      Although Defendants previously admitted that the Agreement did not expire before the Transaction, Defendants now take the position that the Agreement expired in May of 2006. Defendants thus unlawfully refused to pay AMA even though AMA identified and approached parties who, upon information and belief, are affiliated with the eventual Transaction counterparty or counterparties.

6.      Simply put, AMA rendered services to the Defendants, Defendants

encouraged AMA to render such services and they accepted same, but now the Defendants disregard their obligation to pay. The Defendants have done so despite the fact that they reaped the benefits of AMA's work. As such, AMA is entitled to recovery under the express terms of the Agreement. In addition, it is entitled to recovery under principles of unjust enrichment, quantum meruit, promissory estoppel, equitable estoppel, and negligent misrepresentation.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2). The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between a citizen of a State and citizens of foreign states.

8.      The Court has personal jurisdiction over the Defendants because they regularly conduct business in New York and the United States, as the Defendants contracted for financial advisory services with AMA, which has its principal offices in New York City. The Defendants negotiated and entered into the Agreement in New York. The Defendants regularly do business in New York and engage in other persistent courses of conduct in New York. Representatives of the Defendants traveled to New York City on numerous occasions to meet with AMA and/or potential Transaction counterparties; defendant Sergio Del Bene was present at several of those meetings. In connection with this Transaction, the Defendants originated numerous phone calls to this State, and participated in numerous other phone calls originating from this State. The Defendants sent and received hundreds of emails relating to this Transaction to and from AMA in this State. The Defendants wired retainer payments to AMA's bank account in New York. Defendant Sergio Del Bene even maintains a residence in New York City. Further, at all relevant times the Defendants knew or would be reasonably expected to know that their acts would have consequences in this State.

9.    Venue in this action properly lies in the Southern District of New York under 28 U.S.C. § 1391(a) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because the Defendants transact business in this District.  Venue is also proper under 28 U.S.C. § 1391(d), as Defendants are aliens.

## THE PARTIES

10.    Plaintiff AMA is a limited liability company formed and existing under the laws of the State of New York.  Its principal place of business is located at 405 Lexington Avenue, 67th Floor, New York, New York 10174.

11.    Upon information and belief, Defendant Sergio Del Bene is an individual and a citizen of Argentina who maintains a residence at 200 East 32nd Street, New York, New York 10016.

12.    Defendant IPL is a foreign corporate entity, which, upon information and belief, is formed and existing under the laws of Chile, with its principal place of business located in Santiago, Chile.

13.    Defendant DBSACIF is a foreign corporate entity, which, upon information and belief, is formed and existing under the laws of Argentina, with its principal place of business located in Buenos Aires, Argentina.

## FACTUAL BACKGROUND

### A.    The Parties Enter Into the Agreement

14.    Navieras is based in Valparaiso, Chile, and is the majority owner of an integrated group of Chilean-based companies engaged in marine transportation, logistics services and port operations, principally along the west coast of Latin America.

4

15.    In early October of 2005, the Defendants and AMA began negotiating an Agreement, pursuant to which Defendants subsequently engaged AMA to sell Defendants' interest in Navieras.  At that time, the Del Bene family controlled two companies which owned shares of Navieras:  (i) IPL, which owned 18.8% of Navieras, and (ii) DBSACIF, which owned 5.6% of Navieras.

16.    Through IPL, the Del Bene family also owned 6.2% of Sociedad de Inversiones Paine S.A. ("Paine"), which in turn owned 24.6% of Navieras.  As such, the Del Bene family controlled a substantial interest in Navieras, but they did not control the company.

17.    Before AMA had any dealings with Defendants, members of the Urenda family and/or entities controlled by the Urenda family, offered to purchase the Defendants' interests in Navieras for approximately $50 million.  The Urenda family had a de facto controlling interest in Navieras because it controlled Inversiones Tongoy S.A. ("Tongoy"), which owned 24.6% of Navieras, and it also had a significant interest in Paine, which owned 24.6% of Navieras.  In association with the Gardeweg family, the Urenda family eventually gained a controlling interest in Paine, and in turn gained control of Navieras.

18.    On or about October 13, 2005, Paul Leand ("Leand"), Managing Director and Chief Executive Officer of AMA met with Sergio Del Bene and Nestor Esquerro ("Esquerro"), who represented the Defendants (Del Bene and Esquerro are together referred to herein as the "Defendants' Representatives").  The meeting took place at AMA's offices in New York City.

19.    At that meeting, Leand, on behalf of AMA, advised the Defendants that the Urenda family was the most likely Transaction counterparty for the Del Bene interests.  Indeed, as noted above, the Urenda family had already offered to purchase the Defendants'

interest in Navieras.  AMA, however, advised the Defendants' Representatives that the

Defendants' interest in Navieras was worth significantly more than the $50 million the Urenda

family had offered.

20.     After thorough negotiations, Sergio Del Bene signed the Agreement

retaining AMA on behalf of the Defendants on or about November 7, 2005.  One or both of the

Defendants' Representatives were present in AMA's New York City offices on at least two

occasions when the Agreement was negotiated.

21.     The executed Agreement provides that, among other things, AMA would

perform the following services pursuant to the Agreement (collectively, the "Services"):

(i)     prepare an information memorandum and presentation to be used in
soliciting interest in the Transaction;

(ii)    approach other existing major shareholders [in Navieras] to determine
their interest in the Transaction, or alternatively, the potential of such
other existing shareholders in [Navieras] selling [their] shares alongside
those of the [Defendants];

(iii)   identify and approach additional buyers as required, and aid in
negotiations with the same to conclude the Transaction; and

(iv)    advise the [Defendants] on market conditions and the optimal timing for
the Transaction.

Exhibit A ¶1.

22.     Under the Agreement, AMA is to be paid certain fees, including a

Transaction Fee, as compensation for its Services:  Specifically, the Agreement provides that

"upon the closing of a Transaction, [the Defendants shall pay AMA] a Transaction Fee payable

in cash to AMA based on the Aggregate Consideration . . . ."  See Exhibit A ¶3(a).  Aggregate

Consideration is defined as including "the total fair market value of all cash and/or other

consideration paid to the [Defendants], as well as any amounts paid in escrow and amounts

payable in the future.  The portion of AMA's fee relating to any future payments shall be

estimated and paid at the time of closing; regardless of the timing of future payments."  See

Exhibit A ¶3(c).  Thus, for example, if the Aggregate Consideration was $50,000,001 - $75,000,000, AMA's Transaction Fee would be 2.5% of the gross amount, even if some portion of the Aggregate Consideration is paid in the future.  See Exhibit A ¶3(a).

      23.    The Agreement also provides that "AMA's engagement hereunder shall become effective on the date of signature hereof by the [Defendants] and, unless extended in writing by the [Defendants] and/or AMA, shall expire 6 months from such date . . . ."  See Exhibit A ¶2.  If the Agreement is terminated for any reason, the Fees and Disbursements provisions of the Agreement survive the termination.  AMA is entitled to a Transaction Fee with respect to any Transaction consummated (i) within 12 months of termination, if the Transaction counterparty was identified or contacted by AMA, or (ii) within six months of termination, if the Transaction counterparty was not identified or contacted by AMA.  See id.

      24.    Finally, the Agreement is "governed by, and construed in accordance with, the laws of the State of New York . . . ."  See Exhibit A ¶6.

**B.**    **AMA Performs Services and the Parties Extend the Agreement**

      25.    AMA began work for the Defendants upon AMA's receipt of an executed copy of the Agreement on November 7, 2005.  The Defendants made Esquerro AMA's primary contact person with them on a day to day basis.  AMA and Sergio Del Bene were also in frequent contact.

      26.    Soon after the parties entered into the Agreement, they discovered that it would be difficult to consummate a Transaction before May of 2006, or even before May of 2007.  This was because the Urenda family used its control of Navieras to impede AMA's efforts to gather due diligence information needed to attract a suitable Transaction counterparty for the Del Bene family's interest in Navieras.

27.    In late 2005, AMA contacted a number of qualified investors regarding the Del Bene family's interest in Navieras. Several investors indicated substantial interest in acquiring a controlling interest in Navieras, but less interest in acquiring a minority stake such as the Defendants'.

28.    AMA performed the Services from the date the Agreement was executed until November of 2007 when the Defendants informed AMA of the Transaction, i.e., AMA prepared information memoranda and presentations, approached Navieras shareholders to determine their interest in potential Transactions, identified and negotiated with potential buyers and advised the Defendants on market conditions and the optimal timing of a Transaction.

29.    Indeed, after May of 2006, the Defendants specifically requested that AMA continue to perform Services on their behalf and, as a result, AMA continued to perform Services through early November of 2007. Moreover, the Defendants benefited from the Services performed by AMA both before and after May of 2006.

30.    In fact, in January of 2007, the Defendants assured AMA that the Agreement was still effective. Specifically, Esquerro told Leand that nothing needed to be done to extend the Agreement because it was continuing in full force and effect.

31.    Moreover, on March 7, 2007, Defendants executed a writing that is dispositive in this case. Specifically, it memorializes in writing what the parties already knew and what their conduct already demonstrated – that the terms of the Agreement were continuing in full force and effect and that the Defendants' engagement of AMA was extended and on-going. The written extension of the Authorization Period (as that term is defined in the Agreement) was in the form of an email from Esquerro to Leand and others, copied to Sergio Del Bene stating, "[i]t goes without saying that we'll honour [sic] our commitment with you." A true

8

and correct copy of such email is annexed hereto at Exhibit B and is incorporated herein by reference.

1.    **Details of AMA's Services**

    a.    **AMA Was Instrumental in Dealing with the Parties that Ultimately Entered into the Transaction**

    32.    AMA dealt extensively with the Urenda family, the Gardeweg family, and Southern Cross Group, L.L.C. / Southern Cross Capital Management ("Southern Cross"), which which ultimately entered into the Transaction through certain of their affiliates.

    b.    **AMA Prepared Memoranda and Presentations**

    33.    AMA prepared numerous information memoranda and presentations to assist Defendants with the Transaction. For example, AMA prepared a February 2006 presentation regarding Navieras and a potential Transaction. In early 2007 (well after the supposed termination in May of 2006), AMA drafted a presentation that defendant Sergio Del Bene presented to Paine shareholders. As noted above, Paine was a direct and major Navieras shareholder.

    c.    **AMA Facilitated Negotiations with Existing Major Shareholders**

    34.    On behalf of Defendants, AMA also approached existing major shareholders in Navieras to determine their interest in a Transaction, or alternatively, their willingness to sell their shares alongside those of the Defendants.

    35.    As early as March of 2006, AMA met with representatives of Tongoy and the Urenda family in Chile to explore these entities' interest in a Transaction or their willingness to sell in conjunction with the Defendants. AMA requested another meeting with representatives of the Urenda family in late May of 2006. AMA continued communicating with the Urenda

family (despite the Urenda family's refusal to sell their interest in Navieras alongside the
Defendants).

36.     In response to AMA's efforts, in approximately March of 2007, the
Urenda family once again expressed serious interest in a Transaction. See Exhibit B.

37.     Thus, on March 9, 2007, the Defendants emailed a representative of the
Urenda family the following statement, which expressly recognizes AMA's ongoing role in and
commitment to the Transaction:

> after extensive and intensive consideration of this matter, **and considering our
> arrangements with our advisors AMA,** we came to the conclusion that it is best
> that any negotiations either of yourself alone or in combination with your
> partners, are carried on directly with them [sic] who have all the information
> needed to answer their [sic] questions.  If you consider that this a viable road to
> continue, please let me know as **I am sure that the people in [sic] AMA would
> be immediately at your disposal and able to travel on short notice to make
> sure that you have all relevant information to make a decision.**

See March 9, 2007 email from Esquerro to Leand and others, copying Sergio Del Bene
(emphasis added), annexed hereto at Exhibit C and incorporated herein by reference.  Shortly
thereafter, the Defendants shared with the Urenda family a valuation of Navieras prepared by
AMA.

38.     AMA also worked with other Navieras shareholders to help the
Defendants elect another representative, Frederick Meier, to the Navieras Board of Directors (the
"Navieras Board").  Due to these efforts, Mr. Meier was elected on April 27, 2006 and served on
the Navieras Board until August 9, 2007.

39.     Mr. Meier's involvement with the Navieras Board helped the Defendants
to insure that there was no diminution in the value of their shares.  Additionally, the fact that the
Defendants had another representative on the Navieras Board helped instill confidence in
potential Transaction counterparties that Navieras was properly governed.  Mr. Meier's presence

on the Navieras Board also encouraged the Urenda family and other counterparties to put forward a more significant offer to purchase the Defendants' interest in Navieras.

40.     In late 2006 and early 2007, AMA continued acting on behalf of Defendants by, among other things, approaching Paine (another major Navieras shareholder) regarding a potential Transaction.  AMA and Sergio Del Bene met with at least one Paine shareholder in Santiago, Chile, in February of 2007.  At the behest of the Defendants, AMA also arranged meetings with other Paine shareholders, but those shareholders cancelled their meetings.  Shortly thereafter, Sergio Del Bene met with Paine shareholders and used the presentation AMA prepared to encourage the Paine shareholders to act jointly to realize value in Paine, which would in turn maximize the value of their interests in Navieras to a potential Transaction counterparty.

### d.     AMA Identified, Approached, and Aided in Negotiations with Additional Potential Buyers

41.     AMA identified and approached dozens of other potential Transaction counterparties and aided in negotiations with those entities where possible.  Those entities included Ospraie Advisors, L.P. ("Ospraie"), Southern Cross, Citibank Venture Capital International, New York ("CVC"), the Gardeweg family, Ultragas, Ultrapetrol, SIPSA, and Hamlin.

42.     As a result, AMA obtained a preliminary offer letter from Southern Cross in March of 2006.  Southern Cross wanted to perform full due diligence with respect to Navieras, but the Urenda family would not allow it.

43.     Sergio Del Bene used Southern Cross' offer in his presentation to Paine shareholders (drafted by AMA) in February of 2007 in Santiago, Chile and in negotiations with the Urenda family.

11

44.    AMA also obtained a letter of intent from CVC in June of 2006.

45.    AMA approached both Ultrapetrol and SIPSA in the Spring of 2007.

46.    AMA discussed the possibility of a Transaction with the Gardeweg family in May of 2007.

47.    AMA had discussions with Ospraie regarding a Transaction beginning in July of 2007 and continuing into October of 2007.  During that time period, Sergio Del Bene attended a meeting between AMA and Ospraie in New York.

**e.    AMA Advised the Defendants on Market Conditions and the Optimal Timing for the Transaction**

48.    AMA continuously followed the markets in which Navieras operated and regularly updated the Defendants in this regard.  AMA also advised the Defendants with regard to the optimal valuation of and timing for the Transaction.  AMA's market and timing analyses are incorporated in the various presentations and memoranda AMA prepared in connection with soliciting interest in a Transaction.

**C.    The Defendants Complete A Transaction**

49.    Upon information and belief, the Defendants entered into a Transaction on November 6, 2007.

50.    Upon information and belief, the Transaction counterparties were Celfin Capital S.A. ("Celfin"), Naval S.A. ("Naval"), and/or Sociedad Nacional de Valores S.A. ("Valores").

51.    Upon information and belief, the Gardeweg family and/or Southern Cross influences and/or controls Celfin.

52.    Upon information and belief, the Gardeweg family and/or Southern Cross indirectly own shares in Paine.

12

53.    Naval is a Paine shareholder, and upon information and belief, the Urenda family influences and/or controls Naval.

54.    Valores is a Navieras shareholder, and upon information and belief, the Urenda family influences and/or controls Valores.

55.    Upon information and belief, the Defendants received Aggregate Consideration for the Transaction in excess of $60 million.

56.    In November of 2007, Esquerro told Leand that there would not be any problem with AMA collecting its Transaction Fee, as he and Leand had already discussed.

57.    On November 26, 2007, AMA sent an invoice to the Defendants.

58.    The Defendants refused to pay AMA the amount invoiced.  Instead, the Defendants, through their counsel, now contend that "the engagement ended on or about May 4, 2006" and that "AMA [is] not [] entitled to any fee."  See March 18, 2008 letter from Matthew Sheppe, Esq. to Paul M. Leand, Jr. annexed hereto as Exhibit D and incorporated herein by reference.  This is absurd in light of AMA's extensive and ongoing performance, which Defendants encouraged and readily accepted, for over a year following the purported "end date" of AMA's engagement.

59.    Indeed, Esquerro and Del Bene even admitted to Leand that the Agreement had not expired, but said instead that they never intended to pay AMA the full Transaction Fee specified in the Agreement in the event of a sale to the Urenda family (despite the plain language in the Agreement to the contrary).

60.    Finally, AMA incurred expenses for which the Defendants must reimburse AMA pursuant to ¶3(b) of the Agreement.  These expenses total approximately $100,000.  In addition to its rights under the Agreement, AMA obtained the Defendants' explicit consent to

incur these expenses. The Defendants are contractually obligated to reimburse AMA for these expenses, but have not done so.

## COUNT I
### (Breach of Contract)

61.　　Plaintiff repeats and realleges Paragraphs 1 through 60 as though fully set forth herein.

62.　　The Defendants breached their contractual obligations to pay AMA under the Agreement and under the extensions of the Agreement. In addition, by the conduct described above, the Defendants have, without justification or excuse, breached their contractual duties, including their implied obligation of good faith and fair dealing, owed to AMA pursuant to the Agreement and the extensions of the Agreement.

63.　　As confirmed by the parties' course of dealing and partial performance, the parties agreed to extend the Agreement such that it remained in effect until the Transaction. This course of conduct, at a minimum, ratifies the Defendants' pre-existing obligations and constitutes a waiver of the Defendants' ability to rely upon the initial six month term set forth in the Agreement.

64.　　Despite the Defendants' eighteen month assent to the Agreement, the Defendants now insist that the Agreement expired in May of 2006.

65.　　The Defendants' March 7, 2007 email, among others, materially satisfied the requirements of the Agreement. The email met the specifications for an extension of the Agreement.

66.　　The Defendants breached the covenant of good faith and fair dealing by reneging on the Agreement and the parties' extension thereof and in failing to pay AMA a Transaction Fee.

67.    The Defendants' actions fundamentally alter the nature of the parties' bargain and (if allowed) would deprive AMA of a significant portion of the value of the Agreement.

68.    The Defendants' breaches are material.

69.    AMA has duly performed all of the conditions and duties imposed on it under the Agreement and at all times has remained ready, willing and able to continue doing so.

70.    As a result of said breaches, AMA has suffered, and continues to suffer, damages in an amount to be proven at trial, currently estimated to be, at a minimum, $1,600,000.

## COUNT II
### (Unjust Enrichment)

71.    Plaintiff repeats and realleges Paragraphs 1 through 70 as though fully set forth herein.

72.    The Defendants' improper actions, as described above, have resulted in their unjust enrichment. The Defendants should not be allowed to retain the benefits that they unjustly received at AMA's expense. Equity and good conscience require that such things of value be restored to Plaintiffs.

73.    Defendants should be made to pay to AMA in money damages the sums of all such benefits, through a damages measure which includes, but is not limited to, the value of Plaintiff's right to receive a Transaction Fee, currently estimated to be at least $1,500,000, and reimbursement for costs and expenses it is entitled to under the Agreement, estimated to be at least $100,000.

74.    In the alternative, Defendants should be compelled to disgorge, into a common fund for the benefit of Plaintiff, all proceeds unlawfully or inequitably received by it as a result of its participation in the conduct described above.

15

## COUNT III
### (Quantum Meruit)

75.    Plaintiff repeats and realleges Paragraphs 1 through 74 as though fully set forth herein.

76.    AMA performed Services for the Defendants in good faith.

77.    The Defendants accepted those Services.

78.    AMA expected compensation for the Services it rendered for the Defendants and the Defendants were aware that AMA expected such compensation.

79.    The reasonable value of AMA's Services is, at a minimum, (i) 2.5% of the gross amount of the Aggregate Consideration the Defendants received as a result of the Transaction, which is the Transaction Fee the parties agreed to, and which equals approximately $1,500,000, and (ii) AMA's costs and expenses pursuant to the Agreement, estimated at approximately $100,000.

## COUNT IV
### (Promissory Estoppel)

80.    Plaintiff repeats and realleges Paragraphs 1 through 79 as though fully set forth herein.

81.    On March 7, 2007 and on other occasions, the Defendants made clear and unambiguous promises to extend and honor their commitment to pay AMA a full Transaction Fee. Defendants intended that AMA would rely upon these promises.

82.    AMA had no reason to know that Defendants would not adhere to this promise and thus AMA reasonably relied on the Defendants' promise and it was foreseeable that it would do so.

83.    The Plaintiff would be prejudiced by its reliance on Defendants' representations and omissions if Defendants are allowed to deny the truth thereof.

84.    AMA has sustained injury by reason of its reliance on the Defendants' promise.

85.    As a result, AMA has suffered, and continues to suffer, damages in an amount to be proven at trial, and seeks (i) to enforce the payment of $1,500,000, at a minimum, as a Transaction Fee based on the Agreement, and (ii) to collect the costs and expenses for which it is entitled to reimbursement pursuant to the Agreement, estimated to be at least $100,000.

## COUNT V
### (Equitable Estoppel)

86.    Plaintiff repeats and realleges Paragraphs 1 through 85 as though fully set forth herein.

87.    By the conduct described above, the Defendants are estopped from denying their obligation to pay AMA a Transaction Fee under the Agreement and the parties' course of dealing.

88.    AMA rightfully relied upon the words and deeds of the Defendants and in so relying, changed its position to its injury.

89.    In AMA's communications with the Defendants, Defendants misled AMA into believing that Defendants would extend and honor the Agreement beyond the Agreement's initial six month term.  The Defendants' representations were false.

90.    The Defendants intended and expected AMA to rely upon the Defendants' false representations.  Indeed, the Defendants encouraged AMA to continue to render Services until the time of the Transaction.  All the while, the Defendants did not intend to honor the Agreement.  In fact, the Defendants never intended to pay AMA a Transaction Fee if the Urenda

17

family was associated with the Transaction counterparty.

91.    AMA had no reason to know that Defendants would not adhere to this promise and thus AMA relied upon the Defendants' misrepresentations which caused AMA to change its position to its substantial detriment. AMA expended hundreds of man hours and thousands of dollars in expenses performing Services for the Defendants.

92.    AMA would be prejudiced by its reliance on the Defendants' representations and omissions if the Defendants are allowed to deny the truth thereof.

93.    As a result, AMA has suffered, and continues to suffer, damages in an amount to be proven at trial, and seeks to enforce the payment of, at a minimum, $1,500,000 as a Transaction Fee based on the Agreement and to collect the costs and expenses for which it is entitled to reimbursement pursuant to the Agreement, estimated to be at least $100,000.

## COUNT VI
### (Negligent Misrepresentation)

94.    Plaintiff repeats and realleges Paragraphs 1 through 93 as though fully set forth herein.

95.    The Defendants made statements assuring AMA that they would extend and honor the Agreement in order to induce AMA to continue to perform Services under the Agreement. AMA relied on the Defendants' statements in furtherance of that purpose.

96.    The Defendants' acts and communications with AMA show that the Defendants understood AMA's reliance.

97.    As a direct and proximate result of the Defendants' misrepresentations and omissions, AMA has sustained damages in an amount to be determined at trial, and seeks to enforce the Defendants' obligation to pay a Transaction Fee of at least $1,500,000, as well as reimburse AMA's costs and expenses pursuant to the Agreement, estimated to be at least

$100,000.

**WHEREFORE** Plaintiff respectfully requests that this Court grant relief as follows:

A.      Issuance of a judgment declaring that:  (i) the Defendants' failure to pay the Transaction Fee was unlawful; (ii) the Defendants have committed material breaches of the Agreement, and the Agreement as modified by the parties' agreement and course of dealing, which have damaged AMA; (iii) to induce Plaintiff to perform under the Agreement, Defendants misled the Plaintiff into believing that Defendants intended to extend and honor the Agreement when Defendants had no intention of abiding by such assurances; and (iv) the Defendants are estopped from asserting that the Agreement expired;

B.      Compensatory damages in an amount to be determined at trial;

C.      Issuance of an Order directing the Defendants to account for all gains, profits and advantages derived from their wrongful acts and omissions;

D.      Issuance of an Order directing that all gains, profits and advantages derived by the Defendants from their wrongful acts and omissions be deemed to be held in a constructive trust for the benefit of AMA;

E.      Issuance of a judgment awarding AMA its costs and expenses in this litigation, including but not limited to its attorneys' fees, expert fees, and other costs and disbursements;

F.      Pre-judgment and post-judgment interest; and

G.      Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 6, 2008
      New York, New York

                        WOLLMUTH MAHER & DEUTSCH LLP

                        By _____
                              David H. Wollmuth
                              Vincent T. Chang
                              Thomas Filardo

                        500 Fifth Avenue
                        New York, New York 10110
                        (212) 382-3300

                        Attorneys for Plaintiff
                        AMA Capital Partners LLC

# Exhibit A

8/11 '05 LUN 18:31 FAX    ☑001

# AMA
## CAPITAL≋PARTNERS

The Chrysler Building ▪ 67th Floor ▪ 405 Lexington Avenue ▪ New York, NY 10174 ▪ Tel: (212) 682-3344 ▪ Fax: (212) 682-2546

November 4, 2005

Mr. Sergio Del Bene
Del Bene S.A.
Piedras 77, Piso 9
(1070) Buenos Aires
Argentina

Dear Mr. Del Bene:

This letter agreement (the "Agreement") shall confirm the engagement of AMA Capital Partners ("AMA") by Mr. Sergio Del Bene (together with Inversiones Patagonia Ltda and Del Bene S.A.C.I.F., collectively the "Company") as the Company's exclusive financial advisor ("Financial Advisor") in connection with the potential sale (the "Transaction") of the Company's shareholding in Empresas Navieras S.A. AMA will provide financial advice to the Company, subject to the following terms and conditions:

The Company hereby appoints AMA to act as Financial Advisor during the Authorization Period (as hereinafter defined). The Company agrees that it will not hold AMA liable or responsible in the event that the Transaction is not consummated for any reason whatsoever, including, but not limited to, an adverse change in the financial markets or a lack of interest in the Transaction.

1.  <u>Services to be Rendered</u>. As Financial Advisor to the Company, AMA will perform, among other, the following services:

(i)   prepare an information memorandum and presentation to be used in soliciting interest in the Transaction;

(ii)  approach other existing major shareholders to determine their interest in the Transaction, or alternatively, the potential of such other existing shareholders in selling its shares alongside those of the Company;

(iii)  identify and approach additional buyers as required, and aid in negotiations with the same to conclude the Transaction; and

(iv)  advise the Company on market conditions and the optimal timing for the Transaction.

2.  <u>Authorization Period</u>. AMA's engagement hereunder shall become effective on the date of signature hereof by the Company and, unless extended in writing by the Company and/or AMA, shall expire 6 months from such date (such date, or the end date of any mutually agreed extension being the "Termination Date"; the period from the date hereof through the Termination Date being hereinafter referred to as the "Authorization Period"). The Company will also have the right to terminate this Agreement at any time upon two weeks written notice. Upon any termination, the provisions of Paragraph 3 shall survive the termination of this Agreement and shall remain in effect to the extent such

provisions relate to the payment of a Transaction Fee upon the closing of the Transaction. AMA shall be entitled to payment of the Transaction Fee (as defined) if such transaction is consummated within 12 months of the effective date of such termination. Notwithstanding the foregoing, if a sale is consummated with a party not identified or contacted by AMA during the Authorization Period the provisions of Paragraph 3 shall survive for 6 months from the effective date of any termination.

3.      Fees and Disbursements.

a)      As compensation for AMA's services hereunder, the Company shall pay AMA fees as follows:

(i)      during the Authorization Period but prior to the closing of the Transaction a monthly fee of USD 25,000, payable monthly in advance for a minimum of 2 months and maximum of 3 months notwithstanding the Company's right to terminate this Agreement.

upon the closing of a Transaction, a Transaction Fee payable in cash to AMA based on the Aggregate Consideration (as defined below) paid by the Company in an amount as set forth below.

| Aggregate Consideration (Per Share) | Transaction Fee |
|---|---|
| $0 - $50,000,000 ($0.0 – $0.035794 / share) | 0.5% |
| $50,000,001 - $75,000,000 ($0.035795 – $0.05369 / share) | 2.5% (of gross amount) |
| $75,000,001 or more ($0.053691 or more / share) | 3.5% of the incremental consideration above $75,000,001 ($0.053691 / share). |

b)      In addition, the Company shall promptly reimburse AMA for any and all reasonable out-of-pocket costs and expenses incurred by AMA including but not limited to travel expenses, meeting expenses, and the reasonable fees and disbursements to counsel (if required and agreed by the Company). AMA agrees to obtain prior consent for any single expense in excess of $1,000.

c)      The definition of "Aggregate Consideration" for purposes of calculating AMA's transaction fee shall be deemed to include the total fair market value of all cash and/or other consideration paid to the Company, as well as any amounts paid in escrow and amounts payable in the future. The portion of AMA's fee relating to any future payments shall be estimated and paid at the time of closing; regardless of the timing of future payments.

d)      Without limiting anything else contained herein, no fee payable to any other financial advisor by the Company or any other entity shall reduce or otherwise affect the fees payable hereunder to AMA.



4.    <u>Confidentiality</u>.  The Company agrees that any advice, written or oral, provided by Financial Advisor pursuant to this Agreement will be treated by the Company as confidential and will be used solely for the information and assistance of the Company in connection with its consideration of a transaction of the type referred to in the first paragraph of this Agreement.

Further, in connection with this agreement, it is contemplated that the Company may supply to Financial Advisor certain non-public or proprietary information concerning the Company ("Confidential Information"). Financial Advisor shall use Confidential Information solely for the purposes of rendering services pursuant and in accordance with this engagement and shall not, without the prior written consent of the Company, disclose any Confidential Information to any person, other than its officers, directors, employees and outside Advisor with a need to know, *provided, however*, that the foregoing shall not apply to any information which Financial Advisor is required to disclose by judicial or administrative process in connection with any action, suit, proceeding or claim provided that the Company is given prior notice and a reasonable opportunity to contest the applicability of or minimize the scope of such required disclosure.

5.    <u>Complete Agreement, Severability; Amendments; Assignment</u>.  This Agreement embodies the entire agreement and understanding between the parties hereto and supersedes any prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect such provision in any other respect or any other provision of this Agreement, which will remain in full force and effect. This Agreement may not be amended or otherwise modified or waived expect by an instrument in writing signed by both Financial Advisor and the Company. This Agreement may not be assigned by either party without the prior written consent of each party.

6.    <u>Governing Law; Forum</u>.  This Agreement will be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed entirely in such state.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Financial Advisor the enclosed original copy of this Agreement.

Very truly yours,

AMA Capital Partners LLC

By:    Paul M. Leand Jr.
       Chief Executive Officer

Agreed to and accepted as of the date
first written above.

By: _____

Date and Place: _____

# Exhibit B

# Paul Leand

| | |
|---|---|
| **From:** | Nestor Esquerro [nesquerro@delbene.com.ar] |
| **Sent:** | Wednesday, March 07, 2007 10:33 AM |
| **To:** | Paul Leand; Fred Meier; Morrie A. Sigel |
| **Cc:** | 'Claudio Del Bene'; 'Sergio Del Bene' |
| **Subject:** | Fw: |

Dear Paul,
For news, quite a big one.

I received yesterday the following mail from José Manuel as a continuation of one or two previous ones which touched the subject of our visit to Santiago and the meeting with Paine shareholders. This is why he begins with the phrase "I start from scratch not to complicate things even more".
He continues " The best way to advance in this matter is that you let me have the valuation studies that you have, as well as your ideas on price, in order to make a first approach and see if there is any possibility to materialize a deal. " I request this information in order to hand it over to those who would be my partners in the deal".

They want to deal directly with us. It goes without saying that we'll honour our commitment with you, so this would not be a problem at all. I personally would prefer that you conduct the whole negotiation, but Sergio and Claudio agree that this would be impossible in this case. But then we would like to act only as the face in front of them, and that you provide us with all the info that a prospective buyer might ask for.

Sergio, Claudio and myself will call you a bit later so that we can discuss the above and plan for a collective conference with everyone involved.

Regards,
Néstor.

P.S.: I spoke with Sergio Smith yesterday (Jaime Barahona did not return my calls) who told me that he was very pleased with the meeting and all the information provided, and that for him it was a question of timing and that he was inclined to wait some more time.

----- Original Message -----
**From: JOSE MANUEL URENDA**
**To:** nesquerro@delbene.com.ar
**Sent:** Tuesday, March 06, 2007 7:30 PM

Néstor,

Parto de cero para no enredar más las cosas.
La mejor forma para avanzar en este asunto es que me hagas llegar los estudios de valoración que tengan, como también vuestras pretenciones, de manera de hacer un primer aproche y ver si existe alguna posibilidad de concretar algo.

Requiero de eso antecedentes, toda vez que serán estudiados por quienes serían mis socios en la operación.
Un abrazo y saludos por allá,
jmu
P.S

----- Original Message -----
From: JOSE MANUEL URENDA
To: nesquerro@delbene.com.ar
Sent: Tuesday, March 06, 2007 7:30 PM

Néstor,

Parto de cero para no enredar más las cosas.
La mejor forma para avanzar en este asunto es que me hagas llegar los estudios de valoración que tengan,
como también vuestras pretenciones, de manera de hacer un primer aproche y ver si existe alguna posibilidad
de concretar algo.

Requiero de eso antecedentes, toda vez que serán estudiados por quienes serían mis socios en la operación.
Un abrazo y saludos por allá,
jmu

# Exhibit C

**Paul Leand**

| | |
|---|---|
| **From:** | Nestor Esquerro [nesquerro@delbene.com.ar] |
| **Sent:** | Friday, March 09, 2007 2:38 PM |
| **To:** | Paul Leand; Fred Meier; Morrie A. Sigel |
| **Cc:** | 'Sergio Del Bene'; 'Claudio Del Bene' |
| **Subject:** | Fw: RE: |

Dear all,
please find foll. mail sent to José Manuel which translated reads (+ or -):
.......
"after extensive and intensive consideration of this matter, and considering our arrangements with our advisors AMA, we
came to the conclusion that it is best that any negotiations either of yourself alone or in combination with your partners,
are carried on directly with them who have all the information needed to answer their questions.
If you consider that this is a viable road to continue, please let me know as I am sure that the people in AMA would be
immediately at your disposal and able to travel on short notice to make sure that you have all relevant information to make
a decision."

----- Original Message -----
**From:** Nestor Esquerro
**To:** JOSE_MANUEL URENDA
**Cc:** 'Sergio Del Bene' ; 'Claudio Del Bene'
**Sent:** Friday, March 09, 2007 4:16 PM
**Subject:** Re: RE:

Estimado José Manuel:
Respondo recién hoy porque tuvimos que preparar un tema con Claudio y viajar a Corrientes (donde tenemos la sede
legal de las sociedades) ayer todo el día.

Le dimos una extensa e intensa consideración al tema y como consecuencia te comento que de acuerdo con el
compromiso asumido con nuestros asesores de AMA consideramos conveniente que el trato tuyo ó combinado con tus
socios, sea directamente con ellos que tienen todos los elementos aptos para responder a las inquietudes que puedan
tener los interesados.
Si pensás que es una vía apta para proseguir, te pido que me lo hagas saber porque estoy seguro que la gente de AMA
se pondría a disposición y movilizaría de inmediato para asegurar que tengan la información adecuada para tomar una
decisión.

Cordialmente,
Néstor.

----- Original Message -----
**From:** JOSE_MANUEL URENDA
**To:** Nestor Esquerro
**Sent:** Tuesday, March 06, 2007 7:40 PM
**Subject:** RE:

Te lo acabo de enviar...quedo a la espera entonces.
jmu

-----Mensaje original-----
**De:** Nestor Esquerro [mailto:nesquerro@delbene.com.ar]
**Enviado el:** Martes, 06 de Marzo de 2007 17:40
**Para:** JOSE_MANUEL URENDA
**Asunto:** Re:

José Manuel, estuvimos sin conexión de Internet durante todo el día y recién ahora nos reconectaron.
No sé si tu mensaje es de más temprano. Volveré sobre el tema mañana.
Un abrazo,
Néstor.

231

----- Original Message -----
From: JOSE MANUEL URENDA
To: nesguerro@delbene.com.ar
Sent: Tuesday, March 06, 2007 7:30 PM

Néstor,

Parto de cero para no enredar más las cosas.
La mejor forma para avanzar en este asunto es que me hagas llegar los estudios de valoración que tengan, como también vuestras pretenciones, de manera de hacer un primer aproche y ver si existe alguna posibilidad de concretar algo.

Requiero de eso antecedentes, toda vez que serán estudiados por quienes serían mis socios en la operación.
Un abrazo y saludos por allá,
jmu

# Exhibit D

# REISS EISENPRESS LLP

ATTORNEYS AT LAW

425 MADISON AVENUE

HOWARD R. REISS                  NEW YORK, NEW YORK 10017-1110

SHERRI L. EISENPRESS             TELEPHONE (212) 753-2424

MATTHEW SHEPPE                        FAX (212) 753-3829

AUDREY E. WEINBERGER                mail@reisseisen.com

March 18, 2008

VIA FACSIMILE

Paul M. Leand, Jr.
Managing Director & CEO
AMA Capital Partners LLC
The Chrysler Building
405 Lexington Avenue
67th Floor
New York, New York 10174

Re:   AMA adv. Inversiones Patagonia, Ltda, et al.

Dear Mr. Leand:

This firm represents Sergio Del Bene, Inversiones Patagonia, Ltda. ("Inversiones Patagonia") and Del Bene S.A.C.I.F. (together with Sergio Del Bene and Inversiones Patagonia, the "Company") with respect to their dispute with AMA Capital Partners ("AMA") concerning AMA's claim that the Company owes AMA money. I do not believe you are represented by counsel in this matter at this time, but if you are, please forward this correspondence to them and have them advise me that they are representing you.

I understand you unilaterally imposed an artificial deadline of yesterday for the Company to respond to your proposed settlement offer of $1,000,000.00 plus recoupment of AMA's expenses. The Company has asked me to respond to your offer.

03/18/2008 17:28 FAX 212 753 3829      R.E. & E.      ☒003

Paul M. Leand, Jr.
March 18, 2008
Page 2 of 2

     My understanding is that by letter agreement dated November 4, 2005 (the "Agreement) the Company engaged AMA to act as the Company's financial advisor with respect to the Company's sale of its holdings in Empresas Navieras S.A (the "Agreement"). Section 2 of the Agreement provided that the engagement ended six months from the date the Company signed the Agreement, unless extended in writing. This would mean the engagement ended on or about May 4, 2006. I am aware of no writing that extended this Agreement. If you have any such writing, please provide me with a copy of it.

     Additionally, the tail provision in the Agreement provides that AMA is only entitled to a fee if there is a transaction either within 6 months after termination with a party that was not contacted or identified by AMA or within 12 months after termination with a party that was contacted or identified by AMA. Without regard to the whether or not AMA contacted the parties involved in the eventual transaction, the transaction closed on or about November, 2007. Accordingly, since this was approximately 18 months after the termination of the Agreement, AMA would not be entitled to any fee. Under what set of facts do you contend that the eventual transaction was within the tail of the Agreement (or even within the term of the Agreement)?

     Finally, I understand that AMA is claiming it is owed approximately $1.2 million as a transaction fee. Even assuming AMA can prove that the Agreement was extended in writing and that the transaction occurred either within the term of the Agreement or the tail, can you explain how you calculated that AMA was owed $1.2 million.

     I understand that the Company had made several settlement offers to you, the last of which was for $400,000. This letter will confirm that that offer has been withdrawn. Although the Company would prefer to resolve this dispute amicably, until AMA responds more fully to the issues raised above, the Company has no response to AMA's offer except to reject it.

     I look forward to hearing from you or your lawyers.

Very truly yours,

Matthew Sheppe

cc:    S. Del Bene